Argued and submitted March 3, reversed and remanded for reconsideration
September 17, 1997

The CITY OF PORTLAND,
a municipal corporation,
*Appellant,*

*v.*

Rachel RISTICK,
*Respondent.*

(9211-07632; CA A89329)

945 P2d 98

Bill Manlove argued the cause for appellant. On the brief
was Linda Meng, Chief Deputy City Attorney.

No appearance for respondent.

Before Deits, Chief Judge, and De Muniz and Haselton,
Judges.

DEITS, C. J.

**DEITS, C. J.**

Appellant, the City of Portland, seeks review of a trial court judgment awarding it some, but not all, of the costs that the city sought as a result of rehabilitation efforts undertaken by a receiver pursuant to the Oregon Housing Receivership Act, ORS 105.420 through ORS 105.455, and corollary city ordinances. The city argues that the trial court failed to apply the correct legal standard when it denied the city's request for reimbursement for what it asserts are its reasonable costs in rehabilitating the property.

The Oregon Housing Receivership Act authorizes "county and municipal governments to adopt and implement receivership programs to allow for the upgrading of subdard and abandoned residential properties." ORS 105.420(3).[1] Under the Act, if a city or county concludes that a house is a threat to the public health, safety or welfare, it may appoint a receiver to perform an abatement. ORS 105.420. Abatement is defined in ORS 105.425(1) as:

"[T]he removal or correction of any condition at a property including demolition that violates the provisions of any duly enacted building or housing code, as well as the making of such other improvements or corrections as are needed to effect the rehabilitation of the property or structure, but not including the closing or physical securing of the structure."

The Act provides that a receiver may, among other things, "[e]nter into contracts and pay for the performance of any work necessary to complete the abatement." ORS 105.435(1)(e). Additionally,

"[a]ll moneys expended and all costs and obligations incurred by the receiver in performing the abatement shall be reviewed by the court for reasonableness and their necessity in performing the abatement. To the extent that the court finds the moneys, costs or obligations * * * to be reasonable and necessary, it shall issue an order reciting this fact as well as the amount found to be reasonable and necessary." ORS 105.440(1).[2]

---

[1] Pursuant to the Act, the city adopted Portland City Code (PCC) Section 29.90.010 through 29.90.110 to establish the authority and procedures for housing receivership within the city.

[2] PCC Section 29.90.090 is nearly identical to ORS 105.440(1).

The city's ordinance, adopted to implement the Act, provides:

"When the Director finds residential property in violation of any code enforced by the Bureau of Buildings, and believes that violation is a threat to the public's health, safety or welfare, the Director may apply to a court of competent jurisdiction for the appointment of a receiver to perform an abatement. As used in this Chapter, abatement shall mean the removal or correction of any condition at a property that violates any provision of Titles 18, 24, 25, 26, 27, 28, 29, 31, or 33 of this Code as well as the making of other improvements or corrections as are needed to rehabilitate the property or structure. Abatement may include demolition, but does not include securing a structure against entry." PCC Section 29.90.020.

Pursuant to PCC Section 29.90.020, the city determined that respondent's property was a derelict building and a threat to the public's health, safety or welfare, and the Housing Authority of Portland was appointed receiver of the property. In accordance with ORS 105.440(1), the city then requested the trial court to review and approve the costs that it expected to incur.[3] The trial court reviewed the city's proposed lists of costs, inspected the property and ordered that some of the costs were recoverable from the property owner, but that other costs were not.

The city argues that "[t]he trial court erred in denying reimbursement for the reasonable costs incurred to rehabilitate the property, and allowing only the costs required to correct specific housing code violations[.]" It claims that the trial court applied the wrong standard when it evaluated the city's request for reimbursement of its costs because it improperly limited reimbursement to repairs involving a code violation.

It is rather difficult to determine from the record what standard the trial court used in deciding whether costs

---

[3] After the court approves costs of abatement and the city performs the repairs, the city may demand payment from the property owner for the costs. If the property owner does not make payment within 60 days, a lien may be placed on the property. ORS 105.440(2).

were reimbursable. At the initial hearing, where the city asked the court to review its proposed costs, the costs submitted by the city were based on its estimates of what repairs would be necessary to "rehabilitate" the property. At the hearing, the trial court inquired of the city's representatives whether the court was limited to awarding costs only to those items that were necessary to cure code violations. The city's attorney responded that she believed that that was correct, but that it did not matter in this case because all of the costs that the city was asking for were necessary to cure code violations.

Later, at the same hearing, during a colloquy between the court and a supervisor of city housing inspectors concerning the amount of work that would be necessary to qualify for a rehabilitation loan from the Portland Development Commission (PDC), the supervisor initially stated that he believed that all of the work that was to be done on this property was "code-related, that it does in fact relate to an existing code violation on the property." Later in the discussion with the court, the supervisor acknowledged that some items, such as those related to landscaping, did not involve a code violation. The supervisor explained that all of the work was necessary to qualify for a rehabilitation loan through PDC. The court then expressed its view that the applicable statutes did not give the court authority to award more than was necessary to cure code violations. The court reiterated that it did not believe that the statutes permitted it to allow costs that were necessary to get a loan, but were not related to correcting code violations.

Near the end of this hearing, the city's attorney asserted that the court did have authority to allow costs for items that were not code-related, but were necessary to avoid leaving the house in a damaged state. The city's attorney asked the court to distinguish between habitability and satisfying code violations. Apparently, the city was questioning whether the court would approve costs that it concluded were necessary to meet a standard of "habitability," but that were not necessary to correct code violations. The trial court then stated its opinion that the "definition of habitability is failure to meet applicable municipal codes[.]"

A few days after the hearing,[4] the trial court undertook an item-by-item personal inspection of the house and reviewed all the deficiencies that the city sought to repair and for which it was seeking to recover costs. The court inquired with respect to each item whether it related to a code violation. Some of the items that the court reviewed were not required to fix code violations.

Following the inspection, the court issued a preliminary order delineating the expenses that it would authorize. The court stated in that order that "[t]he items allowed are for *correction of violations* of Title [*sic*] 29 of the City Code or were agreed to by defendant." (Emphasis supplied.) The order also stated that the items for which recovered costs were not allowed were "items [that] are not necessary to correct code violations and were not agreed to by the property owner."

In response to the court's preliminary order, the city asserted in a letter to the court that ORS 105.425(1) allowed for recovery of costs beyond those necessary to cure code violations or that were related to correcting a code violation. The court then issued an opinion letter in which it explained its understanding of PCC Section 29.90.020:

> "I construe this section to mean that when there is a code violation which is believed to be a threat to the public health, safety or welfare, an abatement receivership may be established, and that receivership may correct those code deficiencies and things reasonably related to them. An example might be the cleanup of landscaping which was disrupted by the correction project * * *. I do not interpret this language as a catch-all authority for the City to make improvements or corrections as it deems in its discretion to be desirable."

The court then held that the disallowed improvements are "not reasonable and necessary to correct Code violations or to make the premises reasonably functional as a dwelling."

During a later hearing on this matter, after the work had been completed, the city asked the court to reconsider its

---

[4] It is somewhat difficult to determine the precise dates on which some of these proceedings took place due to apparent errors in the dates on the transcripts.

earlier ruling regarding costs because it believed that the court was limiting costs on the basis of whether they were necessary to meet code. The following colloquy occurred:

"[THE CITY'S ATTORNEY:]  Your honor, I would like to ask the court this clarification. It's my understanding that in the court approved costs, these are costs that the court has said are lienable, because these are the costs that bring the property up to code?

"[THE COURT:]  Correct.

"[THE CITY'S ATTORNEY:]  Okay. I guess the reason the city has included the, quote, city approved costs in this [exhibit], your Honor—and again, just to sort of recycle it again, one more time—the city believes that in order to properly rehabilitate the property and perform an abatement it's necessary to go beyond code levels. And it's the city's position that if a * * * receiver needs to be able to do more than just bring the property up to code, but in fact has to go beyond code to perform an effective abatement.

"I understand that basically the court is excluding those costs and saying those costs are unreasonable. But the city takes a different position; we think that they are reasonable. We understand the court will—wants to lien an amount excluding the city approved costs. It's the city's request that the court include those costs, because we think, one, that they are reasonable, and then, two, they are necessary to carry out our duties under the statute.

"* * * And I guess the city is just concerned about the court's interpretation of the statute, and we'd request again that our city approved costs be included in that amount.

"[THE COURT:]  You're not going to change my view on that. You can take it and have six different eyes look at it—

"[THE CITY'S ATTORNEY:]  I understand.

"[THE COURT:]  —and that's fine, but my decision is based on two things. One, a general rule would be what was necessary to bring it up to code. It wouldn't be strictly limited to that. I can see under the statute you can go farther in some directions, but I just clearly felt that some of the items [for which the city sought costs] were absolutely discretionary and that that was fine if the city wanted them, but it's not something that was chargeable to the owner before the owner could get his property back, or the lender before the

lender could get the property back, that they were largely discretionary and largely cosmetic items."

As noted above, the city argues that the trial court applied the wrong standard in reviewing the proposed costs under ORS 105.435(1)(e). That question is difficult to resolve because, as we also noted above, it appears that both the city and the trial court modified their positions on this issue during the course of the proceedings. Nonetheless, we agree with the city that under the Act, recovery of costs is not limited to those incurred to cure code violations. ORS 105.435 provides that a municipality may perform "*any* work necessary to complete the abatement." (Emphasis supplied.) Abatement includes correcting code violations "*as well as the making of such other improvements or corrections as are needed to effect the rehabilitation of the property or structure*[.]" ORS 105.425(1). (Emphasis supplied.) If the purpose of abatement was to correct only code violations, the emphasized portion of the statute would be superfluous.

Further, although the precise meaning of the term "rehabilitation" is not defined, it is apparent that it means something beyond merely correcting code violations. The dictionary defines "rehabilitate" as "to put on a proper basis or into a previous good state: restore (as something damaged or decayed) to a state of efficiency and good management[.]" *Webster's Third New International Dictionary* 1914 (unabridged ed 1993). Accordingly, abatement involves restoring damaged or decayed property to a "good state." Such restoration work may or may not be necessary to meet code requirements.

The standard reflected in the trial court's final judgment in this case appears to be consistent with the proper standard discussed above. In that final judgment, the court stated that it approved costs that it found "reasonable and necessary to abate the Code violations and to make the property reasonably functional as a dwelling" and rejected claims for costs "that were not reasonable and necessary to correct Code violations or to make the property reasonably functional as a dwelling."

The problem here, however, is that, based on the record, it appears that the court actually reviewed the requested

costs to determine only whether the repairs were necessary to correct a code violation. For example, when the court made its first ruling on which costs it would allow, it expressed the opinion that it could allow costs only for repairs to bring the house into compliance with the housing code. Although the court later indicated that it could also allow costs for repairs that were reasonable and necessary, it did not allow any costs beyond those it had already allowed, with the exception of some costs related to plumbing and electrical repairs that it had concluded were related to already approved items. Even during the hearing at which the city asked the court to reconsider some disapproved costs, the court repeatedly asked questions about whether the items were necessary to cure code violations and indicated that whether an item was necessary to bring the house up to code played a large part in its decision-making process. Additionally, the court expressed its opinion that habitability was the equivalent of "meet[ing] applicable municipal codes."

As discussed above, ORS 105.425(1) allows for reimbursement of work necessary to cure code violations as well as other improvements necessary to rehabilitate the property. Because it is not clear from the record that the court considered any factors beyond what was necessary to cure code violations, it is necessary to remand this case to allow the court to reconsider whether the disallowed items, despite not being necessary to cure code violations, are reasonable and necessary to "complete the abatement." ORS 105.435-(1)(e); ORS 105.440(1).

Reversed and remanded for reconsideration not inconsistent with this opinion.